# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1040 | **DATE** | 7/1/2002 |
| **CASE TITLE** | Talangea Robinson vs. Robert Gerritson, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons set forth in this memorandum opinion and order, Devries' motion for summary judgment is granted in its entirety (28-1) and Gerritson's motion is granted as to Robinson's Section 1983 claims but denied as to her state law claim. (23-1) Defendant Harris' motion for summary judgment is denied as moot. (25-1) This action is set for a status hearing at 8:45 a.m. on July 16, 2002.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | JUL 0 2 2002 | |
| ✓ | Docketing to mail notices. | date docketed | 57 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| SN | courtroom deputy's initials | date mailed notice | |
| | | mailing deputy initials | |

CLERK, U.S. DISTRICT COURT
02 JUL -1 PM 8: 20
FILED-ED 10

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

TALANGEA ROBINSON,                  )
                                    )
            Plaintiff,              )
                                    )
     v.                             )      No.  01 C 1040
                                    )
ROBERT GERRITSON, et al.,           )
                                    )
            Defendants.             )

## MEMORANDUM OPINION AND ORDER

Talangea Robinson ("Robinson") has filed a 42 U.S.C. §1983

("Section 1983") action, together with a related state law claim,

against Village of Calumet Park ("Village") and three of its

police officers: Robert Gerritson ("Gerritson"), Jeffrey DeVries

("DeVries") and Kimberly Reda ("Reda").[1]  Robinson charges that

she was deprived of her constitutional rights under the Fourth

and Fourteenth Amendments[2] in having been (1) arrested without

probable cause, (2) detained unlawfully and (3) subjected to an

unreasonable search and seizure.  As already indicated, Robinson

also asserts a state law claim of false arrest and imprisonment.

Each of Gerritson and DeVries has filed a Fed. R. Civ. P.

("Rule") 56 summary judgment motion, and both have complied (as

---

[1]  Former codefendant Sharon Harris has been dismissed
voluntarily by Robinson.

[2]  As always, this opinion adheres to the conventional and
convenient (though technically imprecise) practice of referring
to the underlying Bill of Rights provision (which of course
imposes limitations only on the federal government) rather than
to the Fourteenth Amendment (which applies to state actors and
has been construed to embody such Bill of Rights guaranties).

has Robinson) with this District Court's related LR 56.1.[3]  For

the reasons set forth in this memorandum opinion and order,

DeVries' motion is granted in its entirety and Gerritson's motion

is granted as to Robinson's Section 1983 claims but denied as to

her state law claim.

## Summary Judgment Standards

Familiar Rule 56 principles impose on parties moving for

summary judgment the burden of establishing both the lack of a

genuine issue of material fact and the movant's entitlement to

judgment as a matter of law (<u>Celotex Corp. v. Catrett</u>, 477 U.S.

317, 322-23 (1986)).  For that purpose this Court must "read[ ]

the record in the light most favorable to the non-moving party,"

although it "is not required to draw unreasonable inferences from

the evidence" (<u>St. Louis N. Joint Venture v. P & L Enters., Inc.</u>,

116 F.3d 262, 265 n.2 (7th Cir. 1997)).  As <u>Pipitone v. United</u>

<u>States</u>, 180 F.3d 859, 861 (7th Cir. 1999) has quoted from <u>Roger</u>

<u>v. Yellow Freight Sys. Inc.</u>, 21 F.3d 146, 149 (7th Cir. 1994):

---

[3]LR 56.1 is designed to facilitate the resolution of Rule 56
motions by calling for evidentiary statements and responses to
such statements (in each instance with record citations), thus
highlighting the existence or nonexistence of factual disputes.
This opinion cites to the two LR 56.1(a)(3) statements as "G. St.
¶ -" and "D. St. ¶ -."  Robinson's responses to those statements
are cited as "R.-G. Resp. ¶ -" and "R.-D. Resp. ¶ -,"  and her LR
56.1(b)(3)(B) statements of additional facts are cited as "R.-G.
Add. St. ¶ -" and "R.-D. Add. St. ¶ -."  This opinion employs the
same "G.," "D." and "R." abbreviations in referring to the
parties' exhibits ("Ex."), memoranda ("Mem."), answering
memoranda ("Ans. Mem.") and reply memoranda ("R. Mem.").

A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole.

As with every summary judgment motion, this Court accepts nonmovant Robinson's version of any disputed facts, but only so long as it is supported by record evidence. What follows in the <u>Facts</u> section is culled in that manner from the parties' submissions.

### Facts

Robinson worked as the general manager of the Plaza Inn Hotel in Calumet Park ("Plaza Inn") from about August or September 1999 until September 2000 (G. St. ¶2). Plaza Inn was owned by Stazde Enterprises, Inc. ("Stazde") (Vlado Lenoch Dep. 6). Among Robinson's duties was logging in the periodic deliveries by Brinks, Inc. of $930 in small bills to be used by the hotel staff for making change ("change deliveries" or "Brinks deliveries") (G. St. ¶¶24, 33).

On September 22, 2000 Stazde Vice President Josef Lenoch ("Lenoch") reported to the Calumet Park police that Robinson was suspected of stealing money from Plaza Inn (G. St. ¶¶9-10),[4] and on September 27 the case was assigned to investigator Gerritson (<u>id</u>. ¶13). For that purpose he was given, along with the initial

---

[4] It is unclear exactly how much money was lost. Initial paperwork showed a shortage of $9,695 (G. Dep. Ex. 1E), but Gerritson later received a memorandum authored by Robinson calculating the shortage at only $5,627 (G. Dep. Ex. 25).

police report, additional documents provided by Lenoch, including information as to Robinson's employment and earnings and an internal Plaza Inn memo documenting accounting shortages (id. ¶14).

After reviewing those papers and deciding that he needed more information, Gerritson obtained more documents from Lenoch on October 6 (id. ¶¶15-16). Among those materials were a spiral notebook containing a handwritten log of entries indicating the dates on which the $930 change deliveries were made (the "safe log") and several dated receipts for Brinks deliveries signed by Plaza Inn employees (id. ¶17). Hotel workers were required to sign for the deliveries and put the money on or under Robinson's desk, and Robinson would then record the deliveries in the safe log and place the money in the change safe (id. ¶¶24, 34) unless such funds (perhaps the entire amount) would have to be made available to the hotel desk clerks to make their own change (R.- G. Add. St. ¶7).[5] Numerous individuals had access to the back office where that money was kept (id. ¶12).

---

[5] According to Gerritson's deposition testimony (G. Dep. 43):

> What she would do is either put all or part of that [$930] at the disposal of the front clerks to make change out of it.

Although Robinson testified in her own deposition that she had also given the combination to the safe where the Brinks money was kept to other hotel employees, there is no evidence that Gerritson knew that at the time of Robinson's arrest.

After considering the added documents, Gerritson wrote a report documenting three unsuccessful attempts to "pick up" Robinson on October 7 (G. Dep. Ex. 4; G. St. ¶22). According to his testimony, he had then intended to ask her to discuss the case with him voluntarily (G. Dep. 37). Then on October 12 Gerritson spoke with one of Robinson's coworkers (G. St. ¶23).

Nearly two more months passed before Gerritson attended a December 6 meeting with Stazde accountant Bernie Nutile ("Nutile") and other Stazde executives (id. ¶¶25-28). Nutile explained Plaza Inn's procedures for handling Brinks deliveries and how she had calculated the cash shortage (id. ¶31). Gerritson verified that the safe log was in Robinson's handwriting and in her control (id. ¶¶32, 33) and further confirmed that Robinson had failed to make log entries documenting certain Brinks deliveries, even though there were receipts for those deliveries signed by Robinson or other hotel employees (id. ¶35). For example, documents revealed that Robinson had logged $930 Brinks deliveries twice a week from the start of her employment in September 1999 until January 2000 (id. ¶18). Then on February 18 Robinson personally signed for a $930 Brinks delivery, but there is no record of that delivery in the safe log (R. Dep. Exs. 2, 8). Other hotel employees signed receipts for Brinks deliveries on February 25 and March 10, but the log does not reflect deposit of that money in the change safe

(R. Dep. Exs. 2, 9, 10). And although an April 30, 2000 memorandum authored by Robinson said that she had stopped the Brinks deliveries as of March 15 because the funds were not needed (R.-G. Add. St. ¶9), receipts signed by other hotel employees showed that Brinks deliveries were accepted (though not logged in) on March 17 and May 5 (R. Dep. Exs. 2, 11, 12).

After the December 6 meeting Gerritson decided that he had probable cause to arrest Robinson (G. St. ¶36). On January 3, 2001 he wrote a report documenting numerous unsuccessful attempts to "pick up" Robinson over the preceding month (id. ¶38). Then on January 12 Gerritson decided to go to Robinson's house and arrest her (id. ¶39), asking Officer DeVries to accompany him, although he did not discuss the evidence against Robinson with DeVries (id. ¶40; D. St. ¶43). Both men rode to Robinson's home in a police car, and they arrested her at about 5 p.m. as she was getting out of her car (id. ¶42). DeVries handcuffed Robinson and placed her in the back of the police car, and they all returned to the police station (id. ¶¶43-44).

At the station Gerritson asked telecommunicator Reda to search Robinson (G. Dep. 88). Before Reda took Robinson into a separate room to be searched, Reda and Gerritson had a conversation (R.-G. Add. St. ¶¶22, 25; G. St. ¶45). No one else was present in the room during the search, and the door was closed (G. St. ¶¶47-48). Robinson claims that she was subjected

to a strip search in which Reda required her to open her blouse, lift up her bra, pull down her pants and take off her boots (R.-G. Add. St. ¶28).

After the search Robinson declined to give Gerritson a statement, and Gerritson placed her in a holding cell (G. St. ¶¶51-54). He then went to obtain statements from some of Robinson's former coworkers. At that time Gerritson was aware that the State's Attorney's office in the Sixth District, of which Village is part, expected police officers at least to attempt to obtain a statement from an accused before seeking the approval of charges by an Assistant State's Attorney (id. ¶56). Gerritson maintains that he was also aware that if obtaining a statement from an accused was not possible, he was expected to obtain statements from other witnesses before calling the State's Attorney's office (id. ¶57). But Alzetta Bozeman-Martin ("Bozeman-Martin"), the Assistant State's Attorney involved in the case, testified only as to an expectation regarding statements from "suspects or proposed defendants" (Bozeman-Martin Dep. 34-37). No evidence (other than Gerritson's own statement) was presented as to any expectation regarding statements from witnesses.

While Robinson remained in the holding cell, Gerritson obtained written statements from two of her former coworkers (G. St. ¶¶59-60). Then he gave Robinson another opportunity to make

a statement (which she refused) before going off duty on the

morning of January 13 (id. ¶¶61-62).  Gerritson obtained a

written statement from a third former coworker on the afternoon

of January 13 (id. ¶63).  None of the coworkers said that he or

she believed Robinson took the money (G. Dep. Exs. 15, 16, 17).

After Robinson was informed of those statements, she still

refused to give a statement herself (G. St. ¶¶64-65).

At about 7:45 p.m. on January 13, Gerritson telephoned

Bozeman-Martin and told her about the documents, the three

witness' statements and Robinson's refusal to give a statement

(id. ¶66).  Bozeman-Martin refused to approve charges, noting in

her report the inability to prove that Robinson had exclusive

control over the missing funds and the absence of any statement

from Robinson (R.-G. Add. St. ¶19).  At 8:22 p.m. Robinson was

released from custody (G. St. ¶68).

Qualified Immunity

Gerritson and DeVries argue that they are entitled to

qualified immunity against Robinson's claims stemming from her

assertedly unconstitutional arrest and detention.  <u>Tangwall v.</u>

<u>Stuckey</u>, 135 F.3d 510, 514 (7th Cir. 1998) (citations and

emphasis omitted) sets forth the operative principle:

> The necessity of protecting police officers from "undue
> interference with their duties and from potentially
> disabling threats of liability" has given rise to the
> doctrine of qualified immunity, which protects "public
> officials performing discretionary functions...against
> suits for damages unless their conduct violates clearly

established statutory or constitutional rights of which a reasonable person would have known."

Qualified immunity shields defendant police officers from liability where their conduct (1) did not violate any clearly established rights and (2) was objectively reasonable (Biddle v. Martin, 992 F.2d 673, 675 (7th Cir. 1992)).

As for the first of those requirements, the principles just reconfirmed in Hope v. Pelzer, 2002 WL 1378412, at *5-6 (U.S. June 27) teach that the nature of the claims at issue here provides no safe harbor for Gerritson. And as for the second requirement, the plaintiff in a Section 1983 case bears the initial burden of establishing the unreasonableness of an officer's belief (Tangwall, 135 F.3d at 519).[6] As this opinion will reveal, probable cause in this case is a close question. But where officers of reasonable competence could disagree, immunity should be recognized (Malley v. Briggs, 475 U.S. 335, 341 (1986)). In those terms, the discussion that follows demonstrates that Gerritson and DeVries are entitled to qualified immunity against each of Robinson's Section 1983 claims.

---

[6] This is not literally true in the summary judgment context, for here Robinson does not have to "show" or "prove" or "establish" anything: Rule 56 requires only that she demonstrate the existence of a genuine issue of material fact to defeat Gerritson's or DeVries' motion for summary judgment. Although this opinion regularly uses the more demanding locution in a shorthand manner, both to avoid the cumbersome repetition of the summary judgment standard and to echo the language of controlling caselaw, this Court has properly imposed the lesser burden on Robinson.

9

## Assertedly Unconstitutional Arrest

Qualified immunity insulates an officer against Section 1983 liability for an alleged unlawful arrest (a Fourth Amendment "unreasonable...seizure") if a reasonable officer could have believed plaintiff's arrest to be lawful in light of clearly established law and of the information that the arresting officer then possessed (Tangwall, 135 F.3d at 514). To avert a finding of an unconstitutional arrest, Gerritson must establish two elements: He had probable cause to believe that Robinson had committed an offense and he was authorized by law to effect a custodial arrest for that offense (Ricci v. Arlington Heights, 116 F.3d 288, 290 (7th Cir. 1997), quoting United States v. Trigg, 878 F.2d 1037, 1041 (7th Cir. 1989)).

Theft consists of a person's knowingly obtaining or exerting unauthorized control over another's property (720 ILCS 5/16-1(a)(1)). Theft of property exceeding $300 but less than $10,000 in value is a Class 3 felony (720 ILCS 5/16-1(b)(4)). In turn, 725 ILCS 5/107-2(1)(c) expressly authorizes an officer to make a custodial arrest "when [h]e has reasonable grounds to believe that the person is committing or has committed an offense." Hence Gerritson was authorized to arrest Robinson if he had probable cause to believe that she had committed theft.

Probable cause to arrest exists for a law enforcement officer when "the facts and circumstances within [his] knowledge

and of which [he has] reasonably trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense" (<u>Booker v. Ward</u>, 94 F.3d 1052, 1057 (7th Cir. 1996), quoting as its ultimate source <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964)). When an officer asserts qualified immunity in defense of an unlawful arrest claim, the court must determine whether the officer "actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed" (<u>Humphrey v. Staszak</u>, 148 F.3d 719, 725 (7th Cir. 1998)). Gerritson's principal argument is that he is entitled to qualified immunity because he had at least "arguable probable cause" to arrest Robinson, employing the term that our Court of Appeals has used to describe the second <u>Humphrey</u> scenario (see <u>Williams v. Jaglowski</u>, 269 F.3d 778, 781 (7th Cir. 2001)).[7]

By the time of Robinson's arrest on January 12, Gerritson had reviewed documentary evidence provided by Lenoch, had met with Stazde executives for clarification of the documents and accounting practices and had interviewed one of Robinson's former

---

[7] Gerritson relies on two Illinois cases to support his determination of probable cause: <u>People v. Wiesneske</u>, 234 Ill. App.3d 29, 38-39, 599 N.E.2d 1266, 1271-72 (1st Dist. 1992) and <u>People v. Kinion</u>, 105 Ill. App.3d 1069, 1071, 435 N.E.2d 533, 535 (3d Dist. 1982). Although both of those cases establish that evidence of manipulation of a company's financial records may be <u>relevant</u> to theft, neither is dispositive on the probable cause issue here because of significant factual differences.

coworkers. From his investigation he knew (1) that Robinson was personally responsible for logging in all Brinks deliveries and for locking the Brinks money in the safe, (2) that Robinson had personally signed for a Brinks delivery on February 18 that was not recorded in the safe log and (3) that other hotel employees had signed for deliveries on February 25 and March 10 that had also not been logged in. No evidence indicated that Robinson had either cancelled those Brinks deliveries or complained about not receiving them as scheduled (although the April 30 memo suggested that Robinson may not have known about the receipted but unlogged deliveries made on March 17 and May 5).

Although evidence sufficient to sustain a conviction is not required, probable cause requires more than mere suspicion (Bostic v. City of Chicago, 981 F.2d 965, 968 (7th Cir. 1992)). And in a damages suit such as this one, the existence of probable cause is typically within the province of the jury, although "a conclusion that probable cause existed as a matter of law is appropriate when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them" (Sheik-Abdi v. McClellan, 37 F.3d 1240, 1246 (7th Cir. 1994)). Because there is certainly room for a difference of opinion as to what inferences were fairly to be drawn from the information known to Gerritson and as to whether those inferences

supported more than mere suspicion,[8] whether probable cause _actually_ existed must be resolved by a trier of fact.

But as the earlier quotation from Humphrey teaches, Gerritson need not establish probable cause as a matter of law to take shelter within the mantle of qualified immunity. Under Humphrey, 148 F.3d at 725) he is also entitled to protection if it can fairly be said that "a reasonable officer could have mistakenly believed that probable cause existed." And in this instance a reasonable officer could have concluded, based on the facts and circumstances recited above, that there was probable cause for an arrest--that is, that Robinson had exerted unauthorized control over funds that she had personally received but failed to record and had done the same with funds for which she had not personally signed but that were routinely handed over to her for log entry and safe deposit.

Robinson is right in saying that Gerritson knew other hotel employees had access to the funds when Robinson made some of the Brinks money available to them for making change. It is thus _possible_ that another employee could be responsible for the missing funds. But the discrepancies between the safe log and

_____

[8] This opinion need not pause on the metaphysical question of how the Rule 56 requirement that all reasonable inferences must be drawn in favor of the party opposing summary judgment (here Robinson) meshes or fails to mesh with the reasonable-inferences component of the probable cause analysis as set out in Sheik-Abdi and like cases.

the receipts, coupled with the absence of any complaints from Robinson that scheduled deliveries failed to arrive or that the safe balance (for which she was responsible) was off, provide a reasonable basis for believing that Robinson had taken the missing money. This Court does not ask whether another more reasonable explanation can be constructed after the fact, but only whether a hypothetical reasonable and equally informed officer could have acted in the same way under the settled law in the circumstances (Humphrey, 148 F.3d at 725, citing Hunter v. Bryant, 502 U.S. 224, 228 (1991)(per curiam)).

Furthermore, Robinson's argument (R. Ans. Mem. 3) that Gerritson had no evidence that she exercised exclusive control over the missing funds does not control the probable cause issue either. Theft requires only unauthorized control. Robinson points to no authority indicating that for probable cause to exist the theft suspect must have been the only individual with access to the missing property. And Robinson's contention that qualified immunity is foreclosed by Gerritson's acknowledgment that he needed "more" before the prosecutor would approve charges is similarly nonpersuasive. That statement does not equate, as Robinson would have it (R. Ans. Mem. 4-5), to an admission that there was no probable cause for the arrest. Although the State's Attorney's office did expect police to try to obtain statements from potential defendants before seeking approval of charges,

there is no authority whatever to suggest that the acquisition of such a statement from an accused is somehow a condition of an officer's probable cause determination. On that score Robinson has presented no evidence to support the inference she urges on this Court: that Gerritson was referring not to the prosecutorial policy but to probable cause in general when he made the challenged statement (G. Dep. 101-02).

Officers are entitled to summary judgment based on qualified immunity if their actions were not objectively unreasonable at the time they were taken (Humphrey, 148 F.3d at 725). Gerritson's summary judgment motion must be and is granted as to Robinson's unconstitutional arrest claim because, on the record here, his belief that she had committed theft was objectively reasonable, even if mistaken.

As for officer DeVries, he first became involved in the Robinson investigation when Gerritson asked that DeVries accompany him to Robinson's residence to assist with her arrest. DeVries contends that because he was under Gerritson's direction and control he was entitled to rely on Gerritson's determination (even if mistaken) that probable cause existed (D. Mem. 1-4).

Tangwall, 135 F.3d at 517 (citations and emphasis omitted) once again teaches the relevant standard:

> Indeed, it is a well-established principle of our jurisprudence that:
>
>> [T]he police who actually make the arrest

> need not personally know all the facts that
> constitute probable cause if they reasonably
> are acting at the direction of another
> officer or police agency.  In that case, the
> arrest is proper so long as the knowledge of
> the officer directing the arrest, or the
> collective knowledge of the agency he works
> for, is sufficient to constitute probable
> cause.

\*      \*      \*

> Therefore, so long as "the facts and circumstances
> within [an agency's collective] knowledge...warrant a
> prudent person in believing that the [suspect] had
> committed or was committing an offense," an officer of
> that agency, acting in good-faith reliance on such
> "facts and circumstances," has probable cause to
> effectuate an arrest.

What has already been said demonstrates that a reasonable officer

in Gerritson's position could have believed that Robinson had

committed a crime.  Both literally and figuratively, DeVries

simply went along for the ride.  Certainly he had no inkling of

any facts to suggest that Gerritson's information could not be

trusted.

This case thus contrasts sharply with situations in which an

officer is held to have an affirmative duty to intervene to

prevent another officer from violating a citizen's constitutional

rights (<u>Yang v. Hardin</u>, 37 F.3d 282, 285 (7th Cir. 1994))--after

all, DeVries had no reason to believe that an unlawful arrest or

any other constitutional violation was in process.  Because

DeVries' reliance on information provided by Gerritson was in

good faith and objectively reasonable, he too is entitled to

qualified immunity. As with Gerritson, his summary judgment
motion is granted as to Robinson's unlawful arrest claim.

Assertedly Unconstitutional Detention

Next Robinson claims that her detention for over 26 hours
was constitutionally unreasonable because "the delay was
occasioned by attempts to gather evidence in order to justify the
arrest" (R. Ans. Mem. 11). To be sure, that time period does not
cross the bright line where detention pursuant to a warrantless
arrest is a per se constitutional violation if a judicial
determination of probable cause is not provided within 48 hours
(County of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991)). But
that of itself doesn't save Gerritson, for a determination made
within that time frame may still constitute a constitutional
violation if the arrestee can prove that "his or her probable
cause determination was delayed unreasonably" (id.)--and for that
purpose "delays for the purpose of gathering additional evidence
to justify the arrest" are unreasonable (id.).

Even in those terms, Robinson's unconstitutional detention
claim still fails. And that is so for precisely the same reason
that was fatal to her unlawful arrest claim: that a reasonable
officer could have concluded, even if mistakenly, that there was
probable cause to arrest her.

Where an officer already has evidence sufficient to
constitute probable cause, he or she is not precluded from

17

bolstering his or her case against an arrestee before obtaining a judicial probable cause determination (<u>United States v. Daniels</u>, 64 F.3d 311, 313-14 (7th Cir. 1995)). This opinion has already held that even if probable cause to arrest Robinson was in fact absent, a reasonable officer could have mistakenly believed that such probable cause existed. Because Gerritson's belief that he had probable cause was objectively reasonable, it follows that his belief that he was conducting further investigation to bolster his already defensible arrest of Robinson (rather than to justify that arrest post hoc) was also objectively reasonable. In sum, Gerritson is entitled to qualified immunity on Robinson's unconstitutional detention claim, and his summary judgment motion is granted on that issue as well.

## False Arrest and Imprisonment Under State Law

Gerritson's qualified immunity from a Section 1983 lawsuit and liability does not provide a shield against Robinson's state law claims, which perforce look to state rules of immunity (<u>Magdziak v. Byrd</u>, 96 F.3d 1045, 1048 (7th Cir. 1996)). Yet Gerritson has invoked no immunity under Illinois law as to Robinson's state law false arrest claim. Instead he simply contends that an action for false arrest cannot lie because "he had probable cause" to arrest Robinson (G. Mem. 11). Because this opinion has already found that the existence of <u>actual</u> probable cause (as opposed to the <u>arguable</u> probable cause that

18

also affords qualified immunity in a Section 1983 action) is for a trier of fact to determine, that argument is rejected as premature. Summary judgment is denied as to this state law claim.

As for DeVries, however, he is entitled to summary judgment under the Illinois Local Governmental and Governmental Employees Tort Immunity Act (the "Act," 745 ILCS 10/1-101 to 10/10-101),[9] as Robinson has essentially conceded (R. Ans. Mem. 2). Under Act §2-202 "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct," which is defined as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property" (Act §1-210).

No reasonable jury could find DeVries willful and wanton for having done nothing more than following the orders of Gerritson, his superior officer for purposes of Robinson's arrest (<u>Doe v. Calumet City</u>, 161 Ill.2d 374, 391, 641 N.E.2d 498, 506 (1994)). Count III is therefore dismissed as to defendant DeVries.

<u>Supervising an Assertedly Unconstitutional Search</u>

Robinson seeks to impose supervisory liability on Gerritson

_____

[9] All references to the Act will take the form "Act § -," omitting the "745 ILCS 10/" portion of the official citations.

for the purportedly unlawful "strip search" conducted by Reda. Because Robinson has proffered no evidence to create a genuine issue in that respect, summary judgment must be granted in Gerritson's favor.

To be held liable under Section 1983 for the conduct of a subordinate, a supervisor must either "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see" (Jones v. City of Chicago, 856 F.2d 985, 992 (7th Cir. 1988). Robinson concedes that Gerritson was not present when she was searched, yet she still seeks an inference that a strip search was performed at his direction (R. Ans. Mem. 9-10). In support of that position, she offers only (1) a police department regulation directing that "prisoners will be thoroughly searched by the arresting officer(s)" and (2) the existence of a conversation between Gerritson and Reda immediately before the search--a conversation that Robinson observed but admittedly did not overhear (id.). Any adverse conclusion from those facts would be sheer speculation, which cannot defeat summary judgment (Hedberg v. Ind. Bell Tel. Co., 47 F.3d 928, 931-32 (7th Cir. 1995)). And Robinson has offered no evidence that Gerritson was informed of and ratified a strip search after the fact.

In opposition to Robinson's unsupported assertions stands Gerritson's uncontradicted testimony that he asked Reda to

conduct a "female pat-down search" (G. Dep. 88) and that he
neither directed nor later approved a strip search of Robinson
(G. Aff. 2). That version controls under the circumstances.

In short, Robinson has presented no evidence that a
reasonable jury could view as tending to show that Gerritson
either directed or ratified a strip search. Her own unsupported
speculation certainly does not suffice. Gerritson is also
entitled to judgment as a matter of law on Robinson's supervisory
liability claim.

## Conclusion

Qualified immunity "gives ample room for mistaken judgments"
by protecting "all but the plainly incompetent or those who
knowingly violate the law" (<u>Hunter</u>, 502 U.S. at 229, quoting
<u>Malley</u>, 475 U.S. at 341). Gerritson is entitled to take shelter
against Robinson's Section 1983 claims under that broad umbrella
because even if there was no probable cause to arrest Robinson, a
reasonable officer could have believed mistakenly that probable
cause existed. But whether probable cause <u>actually</u> existed
remains a question for the trier of fact, so Gerritson is not
entitled to summary judgment on Robinson's state law false arrest
claim. Finally, because Robinson has not carried her burden of
creating a material (that is, outcome-determinative) fact issue
on her supervisory liability claim, Gerritson is entitled to
judgment as a matter of law in that respect. Count I is

dismissed as to Gerritson.

DeVries has established his immunity from Robinson's state law claim as well as from her Section 1983 claim. Consequently his Rule 56 motion is granted in its entirety. Counts I and III are dismissed as to DeVries.

Finally, jurisdiction will be retained over Robinson's state law claim against Gerritson because her federal claims against other defendants in this action are still pending (see United Mine Workers v. Gibbs, 383 U.S. 715, 725-26 (1966)). That completes the partial streamlining of this action via the present motions.

On April 3, 2002 this Court approved the parties' jointly submitted Final Pretrial Order, which among other provisions estimated a trial time of four to five days. This action is set for a status hearing at 8:45 a.m. on July 16, 2002 to discuss (1) whether that estimate still remains accurate in light of the partial dismissal of claims in this opinion and (2) the scheduling of trial of the remaining claims.

Milton I. Shadur
Senior United States District Judge

Date: July 1, 2002

22